# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **CARLOS HILL,** | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| v. | ] Case No.: 6:23-cv-384-ACA |
| | ] |
| **GEORGIA-PACIFIC WOOD** | ] |
| **PRODUCTS, LLC,** | ] |
| | ] |
| Defendants. | ] |

## **MEMORANDUM OPINION**

Plaintiff Carlos Hill asserted claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), "and/or" 42 U.S.C. § 1981 ("Counts One and Two"); disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a) ("Counts Three and Four"); and an unspecified "retaliation" claim ("Count Five") against Defendant Georgia-Pacific Wood Products, LLC ("Georgia-Pacific"). (Doc. 1).

Georgia-Pacific moves for summary judgment on all claims. (Doc. 22). The court **WILL GRANT** Georgia-Pacific's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on all claims.

I.   BACKGROUND

In deciding a motion for summary judgment, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to [Mr. Hill], and to resolve all reasonable doubts about the facts in [his] favor." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1341 (11th Cir. 2022) (quotation marks omitted; alterations accepted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the non-movant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Mr. Hill is a black man who was hired by Georgia-Pacific in November 2020 as a maintenance employee at its lumber sawmill. (Doc. 1 ¶ 10; doc. 7 ¶ 10; doc. 25 at 9 ¶ 20; doc. 31 at 8 (not disputing ¶ 20); doc. 24-3 at 35). In early April 2021, Mr. Hill's direct supervisor or "leadman" told the maintenance manager that he and some of Mr. Hill's coworkers noticed Mr. Hill was "acting strange," meaning he was "kind of lethargic and slurring his words." (Doc. 24-2 at 5). The leadman noticed a pattern of this behavior on Thursdays. (*Id.*). The maintenance manager contacted the plant's human resources manager to see if they could drug test everybody at the plant out of concern for employee safety. (*Id.*). The human resources manager told the

2

maintenance manager that they could not drug test the whole plant or single someone out, so they would have to "catch them in the act and notice it and then [] bring them in and request that they do a drug test." (*Id.*).

The maintenance manager conveyed this message to the leadman and instructed the leadman that the maintenance manager would have to observe the behavior himself. (Doc. 24-2 at 5–6) On April 22, 2021, the leadman reported to the maintenance worker that Mr. Hill could not stay awake and was acting strange. (*Id.* at 6.). The maintenance manager went to Mr. Hill's location and observed Mr. Hill talking and moving slower than normal. (*Id.*). Without explanation, the maintenance manager told Mr. Hill that they needed to go to the front office to see the plant manager and the human resources manager. (*Id.*).

Mr. Hill asked the maintenance manager if he could first use the restroom, to which the maintenance manager agreed. (Doc. 24-2 at 6). After Mr. Hill was in the bathroom for a while, the maintenance manager tried to call him on the radio. (*Id.*). Someone answered the radio and said that Mr. Hill was "headed towards the shop." (*Id.*). The maintenance manager found Mr. Hill and drove him to the front office, where the plant and human resources managers asked Mr. Hill to take a drug test. (*Id.*).

What happened next is in dispute. Mr. Hill testified that when they arrived at the front office, he requested an ambulance and told the managers he thought he was

having a heart attack because his chest was tight, and he said he would "take a drug screen at the hospital." (*Id.*). The managers testified that they did not hear Mr. Hill request an ambulance or express his fear he was having a heart attack. (Doc. 24-1 at 18; doc. 24-2 at 7). It is undisputed that the plant manager told Mr. Hill he could go home to get cleaned up before coming back to the plant for the drug test (doc. 24-3 at 21; doc. 30-1 at 1), but that instead of coming back to the plant, Mr. Hill drove himself to an urgent care to be tested for drugs and COVID (doc. 24-3 at 18, 25; doc. 30-1 at 2). The urgent care gave Mr. Hill the results of his preliminary drug test and his COVID test, both of which were negative, and a work excuse through May 3, 2021 based on COVID exposure. (Docs. 24-3 at 34; doc. 30-4 at 1–2, 4). Mr. Hill testified that he asked his wife to fax these documents to Georgia-Pacific that afternoon.[1]

Georgia-Pacific attempted to contact Mr. Hill the afternoon of April 22, 2021 but Mr. Hill missed the call. (Doc. 24-3 at 47–48). Five days later, Mr. Hill called Georgia-Pacific and spoke to the plant manager, who told Mr. Hill he was

---

[1] Whether these documents were faxed and which documents were faxed are in dispute. Mr. Hill was not present at the time the documents were faxed but testified that he asked his wife, who then asked an unknown third party, to fax all three documents to Georgia-Pacific on the same day Mr. Hill visited the urgent care. (Doc. 24-3 at 50). In support of this testimony, Mr. Hill submits screenshots of four documents, including (1) the results of a COVID test taken at the urgent care on April 22, 2021; (2) preliminary results of a drug test taken on April 22, 2021; (3) an email to an unknown third party that a facsimile was sent to Georgia-Pacific the afternoon of April 22, 2021; and (4) the work excuse issued by the urgent care on April 22, 2021. (Doc. 30-4; *see also* doc. 24-3 at 50). In the absence of a motion to strike Mr. Hill's evidence, the court considers this exhibit and finds that the evidence supports his testimony.

terminated. (*Id.* at 48). Mr. Hill later received a termination letter dated April 27, 2021, which stated he was terminated for refusing to submit to an on-site drug test. (Doc 24-5 at 2).

The company's "Substance Abuse and Testing Policy" provided that Georgia-Pacific could test employees for the presence of certain drugs or alcohol upon management's "reasonable suspicion" that an employee was in violation of the policy. (Doc. 24-6 at 2, 5–6). "Reasonable suspicion determinations" could "be based upon reasonably contemporaneous observations of the individual's behavior or performance," such as appearance, speech, smell of alcohol, "or other indications that the [e]mployee" violated the policy. (*Id.* at 6). The policy "reserve[d] the right" of Georgia-Pacific "to subject . . . [e]mployees to point-of-collection or on-site initial drug and/or alcohol screenings" and warned that "refusal to submit to a test when asked w[ould] be viewed as insubordination and w[ould] subject the individual to adverse employment action, up to and including termination." (*Id.* at 7–8). Georgia-Pacific administered the tests on-site using mouth swabs, which takes "two seconds." (Doc. 24-12 at 7).

After Mr. Hill was terminated, he complained to Georgia-Pacific that his termination was discriminatory and filed a charge of discrimination against Georgia-Pacific with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 30-1; doc. 24-4 at 3–4).

## II.   DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

### 1.   Race Discrimination

In Counts One and Two[2] of his complaint, Mr. Hill alleges that Georgia-Pacific discriminated against him because of his race by denying his request for an ambulance, demanding that he take a drug test, and terminating him.[3] (Doc. 1 ¶¶ 67–78). To survive summary judgment, Mr. Hill must demonstrate that Georgia-Pacific intentionally discriminated against [him] on the basis of a protected characteristic." *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016). Mr. Hill attempts to satisfy this burden using circumstantial evidence. To succeed, he must present enough evidence to raise a reasonable

---

[2] Each of the allegations in Count Two are also contained in Count One. (Compare doc. 1 at ¶¶ 67, 68(c), 69-72, *with id.* at ¶¶ 73-78). The court will address both counts together.

[3] Mr. Hill's complaint does not specify whether he brings these claims under Title VII or Section 1981, but the parties briefing analyzes the claims under Title VII. (*See id.*; *see also id.* ¶ 3). The court will follow the parties lead, noting that Title VII and § 1981 discrimination claims "are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

6

inference of intentional discrimination. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023) (citation omitted) (quotation marks omitted), *cert. denied*, 145 S. Ct. 154 (2024). A plaintiff satisfies this burden by pointing to evidence that demonstrates, among other things, "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (quotation marks omitted); *see also McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024) ("The convincing mosaic approach is—in its entirety—the summary judgment standard.").

Mr. Hill's mosaic does not provide any evidence of racists comments, mistreatment of black employees, or circumstances where employees outside of his protected class failed to take an on-site drug test and were not fired. (*See* doc. 31 at 24–27). Instead, Mr. Hill offers what he characterizes as evidence of systematically better treatment of similarly situated employees, suspicious timing, and pretext. (*Id.*). The court begins its analysis with pretext.

To establish pretext, Mr. Hill must establish that a reasonable jury could disbelieve Georgia-Pacific's nondiscriminatory reason for termination—violating company policy to take a reasonable suspicion drug test on-site—and instead conclude that he was terminated because of his race. *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1016 (11th Cir. 2023). "A plaintiff can show pretext by: (i) casting

7

sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis v. City of Union City*, 934 F.3d 1169, 1186 (11th Cir. 2019).

Mr. Hill has a heavy lift to establish pretext in this case. The undisputed evidence is that Mr. Hill's managers told him he could "go home[,] clean [him]self[,] and come back" to take an on-site drug test. (Doc. 30-1 at 1). Mr. Hill does not dispute that he failed to comply with that instruction. (*See* doc. 24-3 at 21). Nor does he dispute that the only known employees previously terminated by his managers for failing to take a drug test on-site and for committing safety violations were white. (*Compare* doc. 25 at 15 ¶¶ 55-59, *with* doc. 31 at 17–18 (not disputing ¶¶ 55-59)).

Mr. Hill argues that a reasonable inference of pretext is created by the maintenance manager's testimony regarding the need to "catch [Mr.] Hill in the act" and Georgia-Pacific's decision to delay testing him, despite Georgia-Pacific's "safety concerns." (Doc. 31 at 26–27). The court is not persuaded. These contentions raise issues with the timing of Mr. Hill's drug test and do not create a genuine dispute of material fact as to whether Georgia-Pacific's policy permits the termination of employees who fail to submit to on-site drug tests. Mr. Hill also contends that

because Georgia-Pacific's policy allows for discipline short of termination, its decision to terminate Mr. Hill was pretextual. (*Id.* at 26). This argument is foreclosed by the undisputed evidence that the other maintenance workers who refused drug tests and committed safety violations—all of whom were white—were also terminated. (*Compare* doc. 25 at 15 ¶¶ 55-59, *with* doc. 31 at 17–18 (not disputing ¶¶ 55-59)). Moreover, Mr. Hill cannot establish pretext by arguing that he did not believe his actions violated company policy or that he should not have been fired for the violation. *See Phillips v. Legacy Cabinets,* 87 F.4th 1313, 1324 (11th Cir. 2023).

Next, Mr. Hill's claim that there was "systematically better treatment of similarly situated employees" at the plant is unsubstantiated. (Doc. 31 at 23). Mr. Hill relies on two distinct instances in which he was treated differently than other employees at Georgia-Pacific. But two instances of one individual being treated differently from a similarly situated employee does not constitute "systematically" better treatment of similarly situated employees. And even if it did, one instance does not involve a similarly situated employee, and the other does not create a strong enough inference of discriminatory intent required to withstand summary judgment.

Mr. Hill relies on the fact that Aaron Holleman, a white maintenance supervisor, was not asked to take a drug test when he was sick at work. (*Id.* at 23–24 (identifying "Mr. Holleman" as the similarly situated white employee); *see also*

9

doc. 24-2 (identifying "Aaron Holl[e]man" as Mr. Hill's "lead person")). But the incident involving Mr. Holleman is easily distinguishable from that involving Mr. Hill. Unlike with Mr. Hill, there is no evidence that Georgia-Pacific was concerned Mr. Holleman was violating its safety policy or prior instances of Mr. Holleman exhibiting strange behavior, slurring words, or lethargy. (*See* doc. 24-3 at 34). And, unlike with Mr. Hill, there is no evidence that Mr. Holleman's visible symptoms were observed by management and determined to be consistent with a pattern of concerning behavior. (*See id.*).

Moreover, the visible manifestations of Mr. Hill's illness were different from that of Mr. Holleman's. According to Mr. Hill's own testimony, Mr. Holleman was sweating, vomiting, and so obviously sick that others[4] in the general vicinity suggested calling an ambulance. (*Id.* at 34). Mr. Holleman declined the ambulance explaining that he had been recently exposed to COVID and thereafter left the sawmill on his own. (*Id.*). Mr. Hill testified that his visible symptoms included sweating and dropping a few things (doc. 24-3 at 16–17), and Mr. Hill does not dispute that he could not stay awake and was talking and moving slower than normal. (*Compare* doc. 25 at 10 ¶ 25, *with* doc. 31 at 11).[5] Given these differences, the fact

---

[4] In his complaint, Mr. Hill alleged Georgia-Pacific offered to call an ambulance for Mr. Holleman. (Doc. 1 ¶ 34). In his deposition, Mr. Hill testified he did not know who offered to call the ambulance. (Doc. 24-3 at 34).

[5] Mr. Hill also testified that he defecated on himself twice but that this did not occur until after he was asked to go to the front office. (Doc. 24-3 at 18). Because of this sequence, his

that Georgia-Pacific asked a black employee to take a drug test after falling ill at work but did not make the same request of a white employee who also fell ill at work does not establish the "differing treatment due to race" as Mr. Hill contends. (Doc. 31 at 22).

The evidence relating to the provision of wrenches and sockets to a white maintenance employee is a different story. (*See* doc. 31 at 22–23). Georgia-Pacific's maintenance manager testified that all maintenance employees were required to provide their own "hand tools," and Georgia-Pacific provided "specialty tools." (Doc. 24-2 at 13). Mr. Hill testified that he witnessed the maintenance manager giving sockets and wrenches to an unidentified white maintenance employee, whereas Mr. Hill was required to purchase his own. (Doc. 24-3 at 8–10). Mr. Hill acknowledges that the white co-worker received the tools shortly after he was hired, Mr. Hill did not hear any conversation between the manager and the white co-worker, and Mr. Hill did not know whether the white co-worker continued to use these tools throughout his employment. (*Id.* at 9–10). At this stage of the proceedings, the court accepts Mr. Hill's testimony that the white maintenance worker was given tools Georgia-Pacific required Mr. Hill to supply on his own. *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015). And construing this evidence in the light most

---

defecation cannot be considered as evidence to support his claim he was drug tested because of his race.

11

favorable to Mr. Hill, a reasonable juror could infer Georgia-Pacific acted with discriminatory intent in treating Mr. Hill and his white co-worker differently with respect to job duties and resources. But standing on its own, this evidence is not strong enough to shoulder the burden of sufficient evidence through which a reasonable juror could find that Georgia-Pacific refused to get Mr. Hill an ambulance, required a drug test, or terminated Mr. Hill because he is black. *See Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1337–38 (11th Cir. 2015).

Finally, Mr. Hill contends that the delay between the date he violated company policy by failing to take an on-site drug test and date Georgia-Pacific wrote his termination letter is suspicious. (Doc. 31 at 26). Mr. Hill failed to take the on-site test on a Thursday (*see* doc. 24-3 at 50 ("Thursday, April 22[, 2021]")), and Georgia-Pacific wrote the letter three business days later (*see id.* at 12 ("April 27, 2021")). Mr. Hill supports his contention that the timing of his termination letter is suspicious with two facts. First, that the letter was written the same day he contacted Georgia-Pacific after failing to take the on-site test as instructed; and second, that Georgia-Pacific called the urgent care that administered Mr. Hill's drug test that day. (Doc. 31 at 26). These facts do not create an inference. "An inference 'is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact.'" *Ossmann*, 82 F.4th at 1019 (quoting *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 n.25 (11th Cir. 2011)). And even if these facts created

an inference, Mr. Hill does not explain how this suspicion raises an inference of *discriminatory* intent. Consequently, the timing of Mr. Hill's termination letter cannot be used to support his burden of establishing sufficient evidence for a reasonable juror to infer discriminatory intent.

Mr. Hill's evidence is insufficient to survive summary judgment because "[i]n the light most favorable to [him], the evidence at most might support an inference that" Georgia-Pacific discriminated against Mr. Hill with respect to job duties and resources by supplying a white maintenance employee, but not Mr. Hill, with specific tools. *Flowers*, 803 F.3d at 1337. "But [Mr. Hill] offers no evidence, after conducting extensive discovery and assembling a lengthy record, that" the denial of his request for an ambulance, demand that he take an on-site drug test, and his termination "w[ere] pretext of discrimination on the basis of his race." *Id.* at 1338. Accordingly, the court **WILL GRANT** Georgia-Pacific's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on Counts One and Two.

      2.     Disability Discrimination

In Counts Three and Four, Mr. Hill asserts claims of disability discrimination against Georgia-Pacific for denying his request for an ambulance and terminating him. (Doc. 1 ¶¶ 79–94). "The ADA bars employers from discriminating against a qualified individual on the basis of disability." *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1191 (11th Cir. 2024) (quotation marks omitted; alteration accepted).

"In the absence of direct evidence, . . . [a]n ADA plaintiff establishes a prima facie case by showing (1) []he has a disability; (2) []he is a qualified individual under the ADA; and (3) the employer discriminated against [him] on the basis of disability." *Id.* at 1191-92 (quotation marks omitted). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).

Georgia-Pacific argues that Mr. Hill does not establish that he has a disability. (Doc. 25 at 24–25). Mr. Hill responds that he has sufficiently demonstrated that suffers from a "cardiovascular system impairment, which intermittently causes him to have an erratic and elevated pulse rate and chest pain, and substantially interferes with the major life activities of standing and loss of control of his bowels." (Doc. 31 at 28). In support of his disability, Mr. Hill offers his deposition testimony about the episode on April 22, 2021, including that his chest was tight, he believed he was having a heart attack, and his pulse rate was higher than normal. (*Id.*) (citing doc. 24-3 at 16, 47). In addition, Mr. Hill cites to a physical examination performed by a medical clinic in October 2021. (Doc. 31 at 28) (citing doc. 24-8 (redacted); doc. 29-2 (sealed)).

This evidence is insufficient to establish that Mr. Hill's "cardiovascular system impairment" substantially limits Mr. Hill's "major life activities." (Doc. 31 at 28); 42 U.S.C. § 12102(1)(A). In the physical examination record from October

2021, Mr. Hill represented that he had never experienced "[h]eart trouble or high blood pressure" or "tightness," and the medical examiner concluded that his chest and heart were "good" on a scale of "good," "fair," and "bad." (Doc. 24-8 at 12 (redacted); doc. 29-2 at 4 (sealed)). Additionally, Mr. Hill's testimony about the isolated April 22, 2021 episode does not establish the frequency, severity, or duration of cardiovascular episodes he allegedly endures. (Doc. 24-3 at 16, 47); *see Lewis*, 934 F.3d at 1180 (holding that the plaintiff "did not produce sufficient evidence to permit a conclusion that she is actually disabled" because "the record is devoid of evidence of the severity, frequency, and duration of [any] episodes" resulting from her alleged disability).

Because Mr. Hill has not established that he has a disability, the court **WILL GRANT** Georgia-Pacific's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor as to Counts Three and Four.

3.   Retaliation in Violation of the ADA

Finally, Mr. Hill alleges unspecified retaliation against Georgia-Pacific in Count Five of his complaint. (Doc. 1 ¶¶ 95–98). Both Title VII and ADA retaliation claims are assessed "under the same framework," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997), and require a plaintiff to "first exhaust her administrative remedies by filing a Charge of Discrimination with the EEOC," *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018)

(ADA); *see also Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855, 868 (11th Cir. 2024) (Title VII).

Georgia-Pacific argues that Mr. Hill did not exhaust his administrative remedies with respect to his retaliation claim because his complaint alleges a different retaliation claim than that described in his EEOC charge. (Doc. 25 at 29–31). Although the Eleventh Circuit "has noted that judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint," it "has cautioned that allegations of new acts of discrimination are inappropriate." *Batson*, 897 F.3d at 1327. "To determine whether a plaintiff has exhausted her administrative remedies, then, the proper inquiry is whether the plaintiff's complaint is like or related to, or grew out of, the allegations contained in the EEOC charge." *Id.* at 1328 (quotation marks omitted; alterations accepted).

Mr. Hill's EEOC charge describes his *termination* as retaliatory "for seeking the accommodation of going to the doctor for [his] heart condition and being placed off work until May 3, 2021." (Doc. 24-4 at 4). But Mr. Hill's complaint alleges that Georgia-Pacific's *failure to reinstate him* was retaliatory for "complain[ing] to his supervisors" that "his termination was discriminatory and he did not want to suffer from retaliation." (Doc. 1 ¶¶ 96). An EEOC investigation of the allegations contained in Mr. Hill's charge would not "have reasonably uncovered any evidence of retaliation" that may have occurred days after Mr. Hill's termination, especially

16

considering that Mr. Hill's charge does not mention his request to be reinstated. *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1278 (11th Cir. 2004); (*see* doc. 24-4 at 3–4). The court finds that the retaliation claim in Mr. Hill's complaint contains "allegations of new acts of" retaliation—namely, retaliation by failing to reinstate him after his complaint of discriminatory termination—which was not discussed in his EEOC charge. *Batson*, 897 F.3d at 1327.

Because Mr. Hill failed to exhaust his administrative remedies regarding his retaliation claim, the court **WILL GRANT** Georgia-Pacific's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on Count Five.

### III.   CONCLUSION

The court **WILL GRANT** Georgia-Pacific's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor on all claims.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this March 31, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE